**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **METHACTON SCHOOL DISTRICT** | : | **CIVIL ACTION** |
| *Plaintiff* | : | |
| | : | **NO. 16-2582** |
| **v.** | : | |
| | : | |
| **D.W. and R.W., on behalf of G.W., a minor,** | : | |
| **and individually on their own behalf** | : | |
| *Defendants* | : | |

NITZA I. QUIÑONES ALEJANDRO, J.                                      OCTOBER 6, 2017

# MEMORANDUM OPINION

## INTRODUCTION

Presently, before this Court are *cross-motions for summary judgment and/or judgment on the supplemented administrative record* filed by Plaintiff Methacton School District ("School District"), [ECF 26], and by Defendants D.W. and R.W. ("Parents"), individually and on behalf of their minor child G.W. ("Student"), [ECF 27].[1] These motions address the School District's appeal of the decision issued by a Pennsylvania Special Education Hearing Officer ("Hearing Officer") in the underlying due process litigation brought by Parents pursuant to the Individuals with Disabilities Education Improvement Act ("IDEIA"),[2] 20 U.S.C. § 1400 *et seq.*[3] Specifically, the issues presented are whether the Hearing Officer erred in finding that the School District did not offer Student a free and appropriate public education ("FAPE"), that Student's

---

[1]       Exhibit B to Parents' motion is docketed as ECF 28.

[2]       The Individuals with Disabilities Education Act ("IDEA") was amended and renamed the *Individuals with Disabilities Education Improvement Act*, effective July 1, 2005.  *See* Pub. L. No. 108-446, 118 Stat. 2715 (2004).  This Court will refer to the Act as the IDEIA in this Memorandum.

[3]       This Court also considers the parties' responses, [ECF 31, 32], the School District's reply, [ECF 35], the parties' supplemental memoranda addressing new authority, [ECF 38, 39], the administrative record, [ECF 18], and supplements to the administrative record.  [ECF 19-2, 19-3, 19-4, 29-4].

placement at Delaware Valley Friends School ("DVFS") was appropriate, and that Parents are entitled to the requested private tuition reimbursement. These issues have been fully briefed and are ripe for disposition. For the reasons stated herein, Parents' motion is granted and the School District's motion is denied. Consequently, the decision of the Hearing Officer is affirmed.

**BACKGROUND**[4]

During the first grade year in 2006-2007, Student was identified by the School District as a student with learning disabilities in reading and written expression, and a speech/language impairment. (Administrative Record ("A.R.") Ex. 2, (Hearing Officer's March 2, 2016 Decision ("Decision"), ¶ 1). Student was also identified as having impairments related to attention deficient hyperactivity disorder and anxiety. (*Id.*) In three separate reevaluation reports issued in 2012 and 2013, the School District continued to recognize Student's learning disabilities in reading and written expression. (*Id.*).

Student attended the School District's schools through seventh grade. [ECF 26-1 at 2; ECF 27-1 at 2]. At the commencement of the 2013-2014 eighth grade school year, Parents enrolled Student at DVFS. [ECF 26-1 at 2; ECF 27-1 at 3]. Parents sought reimbursement from the School District for Student's private school tuition and, when the School District denied reimbursement, Parents filed a due process complaint. [ECF 26-1 at 2; ECF 27-1 at 3]. On November 3, 2013, the then-assigned hearing officer found in favor of Parents, and ordered the School District to reimburse Parents for the private school tuition costs. (Decision ¶ 2); [ECF

---

[4]   The facts are taken primarily from the Hearing Officer's factual findings, which are deemed to be prima facie correct. *See S.H. v. State-Operated Sch. Dist. of Newark,* 336 F.3d 260, 270 (3d Cir. 2003) ("Factual findings from the administrative proceedings are to be considered prima facie correct."). Additional facts are taken from the administrative record, supplements thereto, and the parties' respective filings, and are largely undisputed, as they relate to this Court's decision. Any factual disputes, to the extent relevant, are noted.

26-1 at 2; ECF 27-1 at 3]. Thereafter, the School District and Parents settled their dispute, with the School District agreeing, *inter alia,* to provide for Student's tuition at a private placement (DVFS) for the 2013-2014 and 2014-2015 school years; *i.e.*, Student's eighth and ninth grade years. (Decision ¶¶ 3-5) (citing P- 35[5] (the "2013 Agreement")). Under the terms of the 2013 Agreement, Parents agreed that Student would undergo a School District reevaluation process in the spring of 2015, with the Parents' permission and cooperation. (*Id.* ¶ 5).

On March 26, 2015, Parents paid a tuition enrollment fee of $3,450.00 for Student to attend DVFS during the tenth grade 2015-2016 school year. (P-40). The School District claims it was unaware of Parents' payment, and characterized the payment as a unilateral decision by Parents to enroll Student in DVFS for the 2015-2016 school year. [ECF 26-1 at 3]. Parents characterized the payment as one made to ensure Student would have a place at DVFS in the event the School District failed to offer him an appropriate education. [ECF 31 at 3].

In the spring of 2015, in accordance with the 2013 Agreement, the School District commenced the reevaluation process of Student which culminated with an April 13, 2015 reevaluation report issued by the School District's school psychologist, Rachel Hawthorne ("Dr. Hawthorne"). (Decision ¶¶ 7-8) (citing S-1). Following the issuance of this report in April 2015, Student's individualized education program ("IEP") team, which included Student, Student's father, a representative for the School District, Dr. Hawthorne, special education and regular education teachers, a speech therapist, and counsel for the parties, met to design an IEP for Student's 2015-2016 school year. (*Id.* ¶ 9); (S-4 at 1). The April 2015 IEP contained ten goals in the following areas; *to wit*: two in written expression, two in organization/study skills,

_____

[5]      References to Parents' Exhibits and the School District's Exhibits are references to exhibits submitted to the Hearing Officer and included in the Administrative Record. Parents' exhibits will be identified as P-1, P-2, etc., and the School District's exhibits will be identified as S-1, S-2, etc.

two in speech and language, three in reading, and one in math. (Decision ¶ 10); (P-37 at 21-35). These goals did not contain any baseline information; instead the goals indicated that the baselines were identified in the present levels of educational performance section of the IEP, which essentially were the reports of standardized achievement testing from the evaluation process written in terms of the School District's curriculum, assignments, or instructional results and that further baseline data would be gathered during the summer of 2015 programming at the School District. (Decision ¶¶ 11-12); (P-37 at 7-12, 21-35). The April 2015 IEP provided a number of program modifications and specially designed instruction for Student, and indicated that Student would be in a regular education program for 67% of the school day. (Decision ¶¶ 13-14).

On May 8, 2015, the School District issued a *notice of recommended education placement* ("NOREP"), which offered Parents the terms of the April 2015 IEP as Student's placement for the 2015-2016 year, recommended that Student attend a high school within the School District during that school year, and denied Parents' request for tuition reimbursement for the upcoming 2015-2016 school year. (*Id.* ¶ 15); (P-38 at 1-4). Parents rejected the May 2015 NOREP. (Decision ¶ 15); (P-38 at 4).

On June 4, 2015, the School District revised the April 2015 reevaluation report to include information obtained from a subsequent reevaluation of Student's speech, language, and occupational therapy needs. (Decision ¶ 16); (S-2 at 1-20).[6] On June 8, 2015, the IEP team met to discuss the June 2015 reevaluation report and to revise Student's IEP. (Decision ¶ 16); (S-4 at 9-11). Thereafter, the School District issued a new NOREP which called for Student to be

---

[6]     The June 2015 reevaluation report is dated "6/4/2013," but it is clear that this is a typographical error, and the correct date is June 4, 2015.

placed at the School District's high school for the 2015-2016 school year and, again, denied the request for tuition reimbursement. (S-3 at 17-20).

In July 2015, Student underwent a private evaluation conducted by Mr. Arthur F. Moffa, II. (Decision ¶ 17); (P-43 at 1-8). On July 26, 2015, Mr. Moffa issued an independent educational evaluation ("IEE"), which included a reading assessment, a behavior assessment, and Mr. Moffa's review of the record and interviews with Student and Parents, (P-43 at 1-8), a copy of which Parents provided to the School District the following day. [ECF 26-1 at 4-5]. On July 28, 2015, Parents submitted their notice of intent to place Student at DVFS for the 2015-2016 school year. [ECF 26-1 at 5; ECF 31 at 14].

In early August 2015, the School District again revised Student's IEP in light of Mr. Moffa's IEE. (Decision ¶ 18); (S-4 at 12-65). The goals of the August 2015 IEP were the same as those established in the April 2015 IEP, with the exception that some of the goals contained intermittent baseline information augmented by assessments of Student's evaluations or grades earned at DVFS. (Decision ¶ 19); (S-4 at 36-50). The August 2015 IEP also indicated that new baselines would be developed within two weeks of the implementation of the IEP, and that for certain goals that had not been assessed by DVFS, the School District would conduct probes to measure Student's current level of mastery, should Student attend a School District school. (Decision ¶ 20); (S-4 at 36-50). On August 20, 2015, the School District emailed the August 2015 IEP and a NOREP dated August 19, 2015, to Parents. (Decision ¶ 21); (S-5 at 1-5). The August 19, 2015 NOREP recommended that Student attend the School District's high school for 2015-2016, and denied Parents' requests for tuition reimbursement for the 2015-2016, 2016-2017, and 2017-2018 school years. (S-5 at 3). On August 21, 2015, Parents filed a special

education due process complaint which led to the underlying proceedings. (Decision ¶ 22); (S-6 at 2-15).[7] Student remains in private placement at DVFS. (Decision ¶ 23).

On October 23, 2015, an evidentiary due process hearing was convened before Hearing Officer Jake McElligott, held over three separate sessions, (*id.* at 1),[8] and concluded on January 11, 2016, with the submission of written closing arguments. (*Id.*); (A.R. Ex. 3-4). Essentially, the issues at the due process hearing were whether Parents were entitled to reimbursement for: (1) the cost of Mr. Moffa's IEE, and (2) Student's private tuition at DVFS for the 2015-2016 school year. (Decision at 3). Parents' argument was centered on their contention that the School District's proposed program and placement was not designed to provide Student a FAPE. (*Id.* at 2).

On March 2, 2016, the Hearing Officer issued a decision applying the *Burlington-Carter* analysis, discussed *infra*, and found that the proposed August 20, 2015 IEP for the 2015-2016 school year was not reasonably calculated to yield meaningful education benefits to Student; that the program which was provided to Student by the private placement was appropriate, that equity did not impact the determination regarding tuition reimbursement; and, therefore, Parents were entitled *only* to tuition reimbursement.

On May 25, 2016, the School District timely filed a complaint in federal court appealing the administrative decision and arguing that the Hearing Officer erred by: (1) concluding that the

---

[7]     Subsequent to filing the due process complaint, on August 26, 2015, the School District offered a revised IEP. (Decision ¶ 26). Parents based their decision to enroll Student in DVFS on the August 20, 2015 IEP, and it is this IEP that the Hearing Officer considered. (*See id.*).

[8]     In the Hearing Officer's decision, findings of fact are set forth in numbered paragraphs, while the introduction and conclusions of law are not; thus, citations to the decision are specified as to paragraph or page number.

School District did not offer Student a FAPE; (2) concluding that Student's placement at DVFS was appropriate; (3) failing to find that the balance of equity favored the School District.

**LEGAL STANDARD**

Under the IDEIA, institutions that receive federal education funding are required to provide all children with disabilities a "free and appropriate public education" or "FAPE." 20 U.S.C. § 1400(d)(1)(A); § 1412(a)(1)(A); *Endrew F. ex rel. Joseph F. v. Douglas Sch. Dist.*, 137 S. Ct. 988, 993 (2017); *D.K. v. Abington Sch. Dist.*, 696 F.3d 233, 244 (3d Cir. 2012). A free appropriate public education "includes both 'special education' and 'related services.'" *Endrew F.*, 137 S. Ct. at 994 (citing 20 U.S.C. § 1401(26), (29)). Once a disabled child is identified, the School District must develop an IEP for the child that is "reasonably calculated to enable [the student] to make progress appropriate in light of the child's circumstances." *Endrew*, 137 S. Ct. at 1001; *see also* 20 U.S.C. § 1414(d) (defining individualized education program).[9] "The adequacy of a given IEP turns on the unique circumstances of the child for who it was created." *Id.* It must "set out a plan for pursuing academic and functional advancement." *Id.* at 999 (citing 20 U.S.C. § 1414(d)(1)(A)(i)(I)-(IV)). Although the state is not required to "maximize the potential of every handicapped child," it must provide an education that confers a "meaningful benefit" to each child. *Ridley School Dist. v. M.R.* 680 F.3d 260, 268 (3d Cir. 2012). The benefit must be substantial, not minimal. *Endrew F.*, 137 S. Ct. at 1001.

The core of the IDEIA is the collaborative process between parents and schools officials to fashion the IEP. *Endrew F.*, 137 S. Ct. at 994 (citing 20 U.S.C. § 1414). This collaboration

---

[9] The IEP is a "written statement for each child with a disability" that includes a statement of the child's: (1) present levels of achievement and performance; (2) measurable annual goals; and (3) the special education and supplementary aids and services to be provided to the child, as well as other details regarding the child's educational program. 20 U.S.C. § 1414(d)(1)(A)(I-IV).

among the parents and educators ensures careful consideration of the child's individual circumstances. *Id.* "It is through the IEP that [t]he 'free appropriate public education' required by the Act is tailored to the unique needs of a particular child." *Id.* at 1000 (internal quotations omitted). The IDEIA "requires that every IEP include 'a statement of the child's present levels of academic achievement and functional performance,' describe 'how the child's disability affects the child's involvement and progress in the general education curriculum,' and set out 'measurable annual goals, including academic and functional goals,' along with a 'description of how the child's progress toward meeting' those goals will be gauged." *Id.* at 994 (citing 20 U.S.C. § 1414(d)(1)(A). "An IEP is not a form document. It is constructed only after careful consideration of the child's present levels of achievement, disability, and potential for growth." *Id.* at 999.

If a school district fails to offer a FAPE, a child may be enrolled in an appropriate private school and the school district may be obligated to reimburse parents for the tuition expenses. 20 U.S.C. § 1412(a)(10)(C)(ii). Otherwise reimbursable tuition expenses, however, may be reduced for equitable reasons, including, the parents' failure to give written notice to the school district that they were rejecting the school district's proposed placement at least ten business days prior to the "removal of the child from the public school," or "upon a judicial finding of unreasonableness with respect to actions taken by the parents." *Id.* § 1412(a)(10)(C)(iii)(I)(bb), (iii)(III); *see also C.H. v. Cape Henlopen Sch. Dist.*, 606 F.3d 59, 67 (3d Cir. 2010) ("[E]ven where private placement is appropriate and reimbursement is otherwise due, the IDEA permits the equitable reduction or elimination of tuition reimbursement under certain circumstances.") (relying on 20 U.S.C. § 1412(a)(10)(C)(iii).

Under the Supreme Court's precedents in *Sch. Comm. of Town of Burlington, Mass. v. Dep't of Educ. of Mass.*, 471 U.S. 359 (1985) and *Florence Cty. Sch. Dist. Four v. Carter By & Through Carter*, 510 U.S. 7 (1993), a "a three-step analysis should be applied to determine whether to order tuition reimbursement." *Sinan L. v. Sch. Dist. of Philadelphia*, 2007 WL 1933021, at *5 (E.D. Pa. July 2, 2007). Under the so-called "*Burlington-Carter* test," a district court must first determine if the school district's proposed IEP constitutes an offer of a "free, appropriate public education." *Id.* (citing *Carter,* 510 U.S. at 16). If the school district does not offer a FAPE, the court must next determine "whether the parents' unilateral placement of the child at a private school was 'proper.'" *Id.* (citing *Carter,* 510 U.S. at 16). Finally, the court should consider whether "equitable considerations are relevant in fashioning relief." *Id.* (citing *Burlington,* 471 U.S. at 374).

If parents believe that an IEP fails to provide their child with a FAPE, they may seek an administrative "impartial due process hearing." 20 U.S.C. § 1415(f). "Any party aggrieved by the findings and decision" made in the administrative proceeding "shall have the right to bring a civil action" in state or federal court. 20 U.S.C. § 1415(i)(2)(A). The district court shall review the record of the administrative proceedings, shall hear additional relevant, non-cumulative and useful evidence at the request of a party, and, based on a preponderance of the evidence, grant such relief as it deems appropriate. 20 U.S.C. § 1415(i)(2)(C); *Susan N. v. Wilson Sch. Dist.*, 70 F.3d 751, 760 (3d Cir. 1995). The district court must give "due weight" to the hearing officer's decision. *Bd. of Educ. v. Rowley*, 458 U.S. 176, 205-06 (1982).

The concept of "due weight" requires a district court to conduct a "modified *de novo* review" of the administrative proceedings. *Shore Reg. High Sch. Bd. of Educ. v. P.S.,* 381 F.3d 194, 199 (3d Cir. 2004); *S.H. v. State-Operated Sch. Dist. of the City of Newark*, 336 F.3d 260,

270 (3d Cir. 2003). Thus, courts are not free to "substitute their own notions of sound education policy for those of the educational agencies they review." *Susan N. v. Wilson Sch. Dist.,* 70 F.3d 751, 757 (3d Cir. 1995) (citing *Rowley,* 458 U.S. at 205-06). A district court reviewing an administrative fact-finder's conclusions must defer to such factual findings unless the court identifies contrary, non-testimonial evidence in the record, or explains why the record, read in its entirety, compels a different conclusion. *S.H.*, 336 F.3d at 270. The district court's review of a hearing officer's application of legal standards and conclusions of law, however, requires no deference to the administrative hearing officer's legal determinations; rather, the legal determinations are subject to plenary review. *Id.* at 271; *Warren G. v. Cumberland Cnty. Sch. Dist.*, 190 F.3d 80, 83 (3d Cir. 1999).

The party challenging the administrative decision bears the burden of persuasion before the district court as to each claim challenged. *M.R.*, 680 F.3d at 270 (citations omitted). As the Supreme Court noted "[t]he burdens of pleading and proof with regard to most facts have been and should be assigned to the [party] who . . . seeks to change the present state of affairs." *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 56 (2005) (quoting 2 McCormick on Evidence § 337 at 412 (7th ed.)). Under the IDEIA, it is the party "aggrieved by the findings and decision" of the hearing officer that seeks to change the present state of affairs. *See* 20 U.S.C. § 1415(i)(2)(A). "Absent some reason to believe that Congress intended otherwise," the burden of persuasion falls where it usually does, on the party seeking relief. *Schaffer*, 546 U.S. at 57-58.

**DISCUSSION**

The issues before this Court are whether the Hearing Officer erred by concluding that: (1) the School District did not offer Student a FAPE; (2) Student's placement at DVFS was

appropriate; and (3) that equity had no bearing on the decision rendered. These issues will be addressed consistent with the *Burlington-Carter* analysis.

*Offer of a FAPE*

At step one of the *Burlington-Carter* analysis, the Hearing Officer made factual findings when analyzing whether the School District's proposed August 2015 IEP constituted a FAPE offering. This Court will defer to these factual findings unless contrary, non-testimonial evidence exists in the record, or the existing record compels a different conclusion. *See S.H.*, 336 F.3d at 270. The School District disagrees with the Hearing Officer's findings and, therefore, bears the burden of persuasion to establish error. *See Schaffer*, 546 U.S. at 57-58; *M.R.*, 680 F.3d at 270.

A FAPE must be "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances," and must offer "'more than *de minimus*' progress from year to year . . . ." *Endrew*, 137 S. Ct. at 1001.[10] "The adequacy of a given IEP turns on the unique circumstances of the child for whom it was created." *Id.* The IDEIA requires that an IEP include, *inter alia*, "a statement of measurable annual goals, including academic and functional goals, designed to—(aa) meet the child's needs that result from the child's disability to enable the child to be involved in and make progress in the general education curriculum; and (bb) meet each of the child's other educational needs that result from the child's disability . . . ." 20 U.S.C. § 1414(d)(1)(A)(i)(II).

---

[10]    In *Endrew*, the Supreme Court overturned a Tenth Circuit decision that concluded a FAPE need only provide *de minimus* educational benefit. The *Endrew* Court noted that the confusion over the standard appears to have resulted from the Supreme Court's earlier ruling in *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cty. v. Rowley*, 458 U.S. 176 (1982). In *Rowley*, the Supreme Court, while declining to "establish any one test for determining the adequacy of educational benefits conferred upon all children covered by the Act," did opine that an educational plan must be "sufficient to confer some educational benefit upon" a child. *Rowley*, 458 U.S. at 200.

Here, the record is substantial. After his review, the Hearing Officer concluded that the August 2015 IEP did not offer a FAPE largely because it "lack[ed] useful baseline data for any of the student's ten goals . . . ." (Decision at 9). The Hearing Officer reasoned that "[a]ppropriate goal-writing starts with an understanding of a student's current achievement levels" and from "weighing this data and the IEP team's consideration of a student's strengths, areas of need, and the District's understanding of potential instruction strategies, the goal itself can be written" to guide instruction and to track progress. (*Id.*). Contrary to this premise, the submitted three IEPs containing the School District's proposed goals, indicated that the baseline data would be ascertained only *after* Student returned to the School District's high school. Based on these incomplete goals, the Hearing Officer concluded that the School District "made no effort to obtain baseline data while [Student] was at [DVFS]" over the spring or summer of 2015, (*id.* at 9-10), or at any time prior to the commencement of the school year which would have allowed Parents an opportunity to evaluate whether the IEPs offered a FAPE. The Hearing Officer rejected the School District's approach in its entirety and was critical of the fact that the School District had access to Student and could have evaluated Student to establish baseline data for Student's goals yet failed to do so. (*Id.*). The Hearing Officer recognized that even where the August 2015 IEP offered some degree of baseline data, the data was based on "assessment results from evaluations, or grades at [DVFS]," while Student's goals designed by the School District were "written in terms of probes and progress on District's curricular materials." (*Id.* at 10). According to the Hearing Officer, this proposal was comparing "apples and oranges;" and if Student was to be assessed on the School District's curricular materials, baseline data could and should have diligently been obtained to allow Student's IEP team an opportunity to craft goals aligned with the data. This oversight, in the Hearing Officer's opinion, demonstrated a

"substantive, and prejudicial, flaw in the design of the IEPs."  (*Id.*).  The Hearing Officer concluded that in providing no, or incomplete, baseline data unrelated to Student's specific goals, Parents were being asked to approve an IEP that was "prejudicially incomplete."  (*Id.* at 11).  Confronted with these inadequacies, the Hearing Officer found the August 2015 IEP was inappropriate.  (*Id.*).

In its defense, the School District argues that the IDEIA does not require that an IEP contain baseline data for each IEP goal but, instead, requires that the goals of an IEP be measurable.  [ECF 26-1 at 17].  The School District contends that the August 2015 IEP contains measurable goals and, therefore, the Hearing Officer erred in finding that the lack of baseline data meant the August 2015 IEP was inappropriate.  (*Id.* at 17-19).

While there are no Third Circuit Court of Appeals or Eastern District of Pennsylvania cases on point, other courts have sided, *in part*, with the School District's contention that there is no strict requirement under the IDEIA for an IEP to include baseline data.  *See Lathrop R-II Sch. Dist. v. Gray*, 611 F.3d 419, 424-25 (8th Cir. 2010) (holding that the IDEIA does not "explicitly mandate" baseline data, but instead only requires "a statement of the child's present levels of educational performance," and "how the child's disability affects the child's involvement and progress in the general curriculum . . . .") (citing 20 U.S.C. § 1414(d)(1)(A)); *Red Clay Consol. Sch. Dist. v. T.S.*, 893 F. Supp. 2d 643, 651 (D. Del. 2012) ("historical baseline data is not a necessary component of an IEP . . . .") (relying on *Lathrop*).  However, the IDEIA requires that the goals in an IEP be designed to "meet the child's needs that result from the child's disability to enable the child to be involved in and make progress in the general education curriculum . . . ."  20 U.S.C. § 1414(d)(1)(A)(i)(II)(aa).

Although an IEP need not include baseline data, the Hearing Officer's rejection of the August 2015 IEP was not premised entirely on the lack of baseline data in the IEP but, rather, was also based on the School District's failure to obtain *any* appropriate baseline data. (Decision at 9-10). The Hearing Officer concluded that failure to obtain any baseline data meant that the goals themselves were insufficient to provide guidance to teachers regarding Student's specific instruction needs based on Student's disabilities, and the expected progress at the district high school. (*See* Decision at 9-10). This Court agrees.

As noted, an "IEP is not a form document. It is constructed only after careful consideration of the child's present levels of achievement, disability, and potential for growth," and it must be the result of "careful consideration of the child's individual circumstances." *Endrew F.*, 137 S. Ct. at 994, 999. An IEP must include "measurable annual goals, including academic and functional goals, along with a description of how the child's progress toward meeting those goals will be gauged," and while the "goals may differ, [] every child should have the chance to meet challenging objectives." *Id.* at 994, 1000.

Here, a careful review of the administrative record compels this Court to find, as did the Hearing Officer, that the School District failed to properly assess Student at any time during the school year or the summer of 2015[11] and, as a result, the School District failed to comply with the IDEIA requirements that the goals in an IEP be designed to "meet the child's needs that result from the child's disability to enable the child to be involved in and make progress in the

---

[11] The School District notes that when it sought to evaluate Student at DVFS in May 2016, Parents refused. [ECF 26-1 at 20-21]. The School District argues that this shows that Parents would not have cooperated with the School District in 2015 had it attempted to obtain baseline data. (*Id.* at 21). That Parents refused to allow Student to be evaluated in May 2016, while the School District was contemplating an appeal of the Hearing Officer's decision, does not support the School District's contention that Parents would have violated the 2013 Agreement and failed to cooperate with the School District in 2015.

general education curriculum." *See* 20 U.S.C. § 1414(d)(1)(A)(i)(II)(aa). The School District did not assess Student's specific needs and/or craft challenging goals tailored to Student's specific circumstances. Clearly, the August 2015 IEP was not designed as required by the IDEIA. *See id.* Though the School District proposed to make the necessary determinations after Student commenced the 2015-2016 school year, these promises are just that, promises. Parents were correct to not gamble on these uncertainties when Student's educational needs were in question. In light of the factual findings, which have not been rebutted, the School District has failed to meet its burden to prove that the facts support overturning the Hearing Officer's decision. *See Schaffer*, 546 U.S. at 57-58. Therefore, the School District's challenge to the Hearing Officer's decision that Student was denied a FAPE is without merit.[12]

*Appropriate Private Placement*

Having concluded that the School District did not offer Student a FAPE, at step two of the *Burlington-Carter* analysis, this Court must determine "whether the parents' unilateral placement of the child at a private school was 'proper.'" *See Sinan*, 2007 WL 1933021, at *5 (citing *Carter,* 510 U.S. at 16). The Hearing Officer concluded that private placement was appropriate because DVFS provided individualized instruction that directly addressed Student's needs, and that Student's performance at DVFS in the 2014-2015 school year supported a finding that DVFS' programming allowed Student to make meaningful education progress. (Decision at 11).

---

[12] The School District also argues the underlying merits of the August 2015 IEP, arguing that it addresses Student's issues regarding reading, writing, mathematics, science, and social studies, anxiety, executive functions, speech and language, as well as plans to transition to public school, preparation for post-secondary school, and specially designed instruction. [ECF 26-1 at 11-17]. None of the arguments, however, address the underlying concern that the goals themselves were not designed under appropriate conditions and are based on incomplete data. The School District's arguments are unpersuasive.

"A private placement is 'proper' if it (1) is 'appropriate,' *i.e.*, it provides 'significant learning' and confers 'meaningful benefit,' and (2) is provided in the least restrictive educational environment." *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 276 (3d Cir. 2007) (quoting *Ridgewood Bd. of Educ. v. N.E. ex rel. M.E.*, 172 F.3d 238, 248 (3d Cir. 1999)).

Generally, the School District argues that placement at DVFS is not proper because Student's needs are not being met, Student is failing to make progress, and that placement there is not the least restrictive environment for Student. Specifically, the School District contends that placement at DVFS is not appropriate because: (1) Student is not receiving counseling or coping skills for Student's anxiety; and (2) relying on Mr. Moffa's IEE, it appears that Student's reading skills have not improved and, therefore, DVFS is not meeting Student's needs. [ECF 26-1 at 22-23]. This Court finds that the School District's assertions are not supported by the administrative record.

At the October 23, 2015 administrative hearing, the issue of Student's anxiety was explored. Student was asked: "Did you notice any difference in your level of anxiety at [DVFS] compared to when you were in the District?" (N.T. 255:14-16). Student responded:

> Yes. At [DVFS], my confidence was amazing and I wasn't scared to walk through the halls or certain halls and—I mean, mostly because it's my—[DVFS] is like a plus shape, so if I was being bullied I would sort of be done by now because you can't skip halls or anything. But I was never bullied, never even once. People even look down on people who call people names. And it's just— it's so different than like what [the School District middle school] was. Like I was bullied every day. And it was just—it was heartbreaking because I didn't do anything to those people. And they just hated me because of my Tourette's and that I was reading in a lower grade than everyone.

(*Id.* at 255:17-256:4). Though the administrative record supports the School District's contention that DVFS may not have provided specific services or remedies to address Student's anxiety, Student testified that the anxiety experienced had been largely caused by the bullying in

the School District's middle school and that the anxiety had been alleviated because the conditions at DVFS did not allow for bullying. Thus, while specific counseling or direct instructions on how to cope with anxiety may have been beneficial, and perhaps necessary at the School District's schools, such programs at DVFS were not requested or necessary and, therefore, are not a basis to overturn the Hearing Officer's finding.

In addition, the School District's assertions that Student's reading skills have not improved and that DVFS is not meeting Student's needs are similarly misguided. While Student does struggle in certain areas, such as in Student's reading rate, which according to Mr. Moffa is in the fifth percentile, (P-43 at 5), Student is excelling in others. Student's reading accuracy falls within the sixty-third percentile, and Student's reading comprehension falls within the fiftieth percentile. (*Id.*). In the IEE, Mr. Moffa indicated that Student "has made great strides in reading since [Student] left the District." (*Id.* at 6). Relying on Mr. Motta's report, as did the School District, the totality of the administrative record undermines the School District's contentions that DVFS is failing Student or is otherwise inappropriate.

Finally, the School District argues that DVFS is not the "least restrictive environment" for Student because it does not provide Student with "opportunities to be educated with [Student's] non-disabled peers." [ECF 26-1 at 23]. The IDEIA requires that to:

> the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

20 U.S.C. § 1412(5). This requirement is referred to as the "least restrictive environment" requirement. *See id*; *see also Shore Reg'l High Sch. Bd. of Educ. v. P.S. ex rel. P.S.*, 381 F.3d 194, 198 (3d Cir. 2004). The School District argues that because DVFS isolates Student from

non-disabled peers 100% of the time, it is overly restrictive. [ECF 26-1 at 23-24]. The Third Circuit, however, has upheld tuition reimbursement even where a student is being placed in a private school that specialized in educating disabled students, noting that the least restrictive environment "test for the parents' private placement is that it is appropriate, and not that it is perfect." *Warren G.*, 190 F.3d at 84.[13] Even if DVFS is overly restrictive, the totality of the administrative record supports that placement at DVFS is appropriate, particularly in light of Student's progress and the reduced anxiety Student experiences resulting from the lack of bullying from non-disabled peers.

After carefully considering the second step of the *Burlington-Carter* analysis, this Court finds that the School District's challenge to Student's placement at DVFS is without merit.

### Balancing of the Equities

Having concluded that the School District did not offer a FAPE, and that private placement at DVFS is appropriate, this Court now turns to the third step of the *Burlington-Carter* analysis: equitable considerations. The School District argues tuition reimbursement should be denied because Parents failed: (1) to give the statutorily prescribed ten-day notice of their intent to enroll Student at DVFS, and (2) to genuinely consider the School District's offer of a FAPE or to otherwise meaningfully participate in the process. [ECF 26-1 at 24-28]. The Hearing Officer did not make any factual findings concerning balancing the equities, but instead concluded that

---

[13]     Several Circuits have suggested that parents are not subject to the same least restrictive environment requirements when seeking private placement. *See C.L. v. Scarsdale Union Free Sch. Dist.*, 744 F.3d 826, 837 (2d Cir. 2014) ("parents . . . may not be subject to the same mainstreaming [or LRE] requirements as a school board.") (quoting *M.S. ex rel. S.S. v. Bd. of Educ. of the City Sch. Dist. of the City of Yonkers*, 231 F.3d 96, 105 (2d Cir. 2000)); *Carter By & Through Carter v. Florence Cty. Sch. Dist. Four*, 950 F.2d 156, 160 (4th Cir. 1991) ("no evidence that the policy was meant to restrict *parental* options when the public schools fail to comply with the requirements of the Act.").

equity does not weigh for or against either party.  (Decision at 11-12).  Thus, there are no factual findings to which this Court must defer.

Section 1412(a)(10)(C)(iii)(I) of Title 20 provides that the cost of tuition reimbursement "may be reduced or denied—if . . . 10 business days . . . prior to the removal of the child from the public school, the parents did not give written notice to the public agency" that they intended to reject "the placement proposed by the public agency to provide a free appropriate public education to their child, including stating their concerns and their intent to enroll their child in a private school at public expense . . . ." 20 U.S.C. § 1412(a)(10)(C)(iii)(I).  A failure to provide statutory notice can result in the reduction or denial of tuition reimbursement even where the School District fails to offer a FAPE and private placement is appropriate.  *C.H.*, 606 F.3d at 71.

Here, the School District argues that by February 2015 Parents had already decided to re-enroll Student at DVFS, and that on March 26, 2015, Parents paid a non-refundable enrollment fee, all before notifying the School District of their private placement intentions, and in violation of § 1412(a)(10)(C)(iii)(I).  [ECF 26-1 at 26].  Parents counter that the statute itself only requires notice "prior to the *removal* of the child from the public school," and since Student was already attending DVFS and had been removed from public school pursuant to the 2013 Agreement, notice was not required.  [ECF 31 at 13-14].  Notwithstanding and in an abundance of caution, Parents on July 28, 2015, sent the School District a letter providing notice of their intent to enroll Student at DVFS for the 2015-2016 year. (*Id.*) (citing P-47 at 9).[14]

While Parents' interpretation of the statute more closely tracks its language, at least one district court has concluded that the notice provision of the IDEIA applies to the re-enrollment of

---

[14]     P-47 was not included as part of the administrative record provided to this Court.  However, the School District, in their motion, concedes that on July 28, 2015, "Parents finally submitted their statutory notice of intent to place Student at DVFS."  [ECF 26-1 at 5].

a student at a private school. *S.W. v. New York City Dep't of Educ.*, 646 F. Supp. 2d 346, 363 (S.D.N.Y. 2009) (noting that interpreting the statute to not require notice before re-enrollment would defeat the aim of the IDEIA to provide children with a FAPE in a public school, and concluding that the notice provision applied to a student who was receiving special education in a private school, paid for with public funds, before the student re-enrolled, so that the school district had the opportunity to devise a FAPE.). Under the facts of this case, however, this Court need not decide whether the notice provision applies to the re-enrollment of Student. Here, Parents provided the School District with sufficient notice of their intent to re-enroll Student at DVFS. Notice was provided by the July 28, 2015 letter, well before the start of the 2015-2016 school year, and by Parents' repeated requests for a FAPE or private placement at DVFS for the 2015-2016 school year. The School District had ample oppurtunity to craft a FAPE for Student and to address Parents' concerns when meeting to discuss the April, June, and August 2015 IEPs, but did not provide one.

Section 1412(a)(10)(C)(iii)(III) provides that the cost of tuition reimbursement "may be reduced or denied—upon a judicial finding of unreasonableness with respect to actions taken by the parents." 20 U.S.C. § 1412(a)(10)(C)(iii)(III). Unreasonableness on the part of the parents can result in the reduction or denial of tuition reimbursement even where the school district fails to offer a FAPE and private placement is appropriate. *C.H.*, 606 F.3d at 71.

The School District argues that Parents' conduct was unreasonable, arguing that Parents never intended to agree under any circumstances to allow Student to attend public school. [ECF 26-1 at 26-28]. The School District supports this contention by asserting that: (1) Parents enrolled Student at DVFS for the 2015-2016 school year on March 26, 2015, when they paid a $3,450.00 non-refundable enrollment fee; (2) Student's father testified at the administrative

hearing that under no circumstances would he enroll Student at a public school; (3) Parents and Student did not visit the high school, observe the learning environment, or otherwise give genuine consideration to the School District's offer; (4) Parents filed an administrative due process complaint "riddled with a number of factually incorrect statements;" (5) Parents threatened School District officials with arrest if they tried to meet with Student at DVFS; and (6) Parents refused the School District's offer in May 2016 to attend the School District's high school in order to conduct certain assessments of Student and also refused to participate in an IEP meeting for the 2016-2017 school year. (*Id.*).

A careful reading of the administrative record reveals that the School District overstates its claims. It should be noted that "[v]igorous advocacy is an anticipated by-product of a policy encouraging parental involvement." *Warren G. ex rel. Tom G. v. Cumberland Cty. Sch. Dist.*, 190 F.3d 80, 86 (3d Cir. 1999); *see also Rowley*, 458 U.S. at 209 ("[P]arents and guardians will not lack ardor in seeking to ensure that handicapped children receive all of the benefits to which they are entitled by the Act."). Courts must be wary of undermining this policy by "placing parents at risk that their advocacy may be found extreme at the cost of full reimbursement." *See Warren G.*, 190 F.3d at 86.

Regarding the School District's specific contentions, this Court opines that Parents' payment of a non-refundable enrollment fee cannot, in and of itself, be interpreted to mean that Parents never intended to agree to public placement. Parents offered a reasonable explanation of the payment, namely, that payment was made to secure Student's place at DVFS, a school Student had attended for two years pursuant to the 2013 Agreement and in which Student was thriving, in the event the School District failed to offer a FAPE, as it had failed to do in 2013 and as confirmed by the due process hearing conducted at that time. [ECF 31 at 3]. Thereafter,

Parents attended the IEP meetings and otherwise participated in the process with the School District.  In light of these facts, the School District's contention that this payment proves Parents' failure to even consider a public education is without merit.

The School District also argues that Student's father testified at the administrative hearing that under no circumstances would he enroll Student at a public school, *purportedly* quoting the following interaction in which Student's father, in response to the question "You would agree with me it would not have mattered what the District would have offered in any IEP, your decision was to return [Student]—or have [Student] remain at [DVFS], correct," responded "I agree. So yes, I agree."  [ECF 26-1 at 26-27) (citing A.R., Notes of Testimony ("N.T.") at 386:24).   The School District's argument is disingenuous and is a gross mischaracterization of the father's testimony.   In response to the question, Student's father actually testified testimony as follows, with the portion omitted by the School District italicized:

> I agree *because I never saw anything that showed me that you can teach* [*Student*] *how to read.  And the track record you had said that you couldn't.  And with what you put in place that you thought was appropriate, it could not.*  So yes, I agree.

(N.T. 368:20-24).   Remarkably, the School District's quoted testimony omits, without even signaling the omission by using ellipsis, the actual testimony that contradicts the School District's claim that Parents would reject any plan that called for returning Student to a public school.  Following the father's above answer, he was asked: "Again, it would not have mattered what the District had offered?"  (*Id.* at 387 at 1-2).  He responded:

> No, it would have.  Oh absolutely.  If you would have said you had a teacher that spoke, that talked—could teach [Student] the Orton-Gillingham and [Student] would not miss a beat from where [Student] left off, I would by all means, say, I think that this is appropriate for [Student].  But you don't.

(*Id.* at 387 at 3-8).  It is clear from a review of the father's entire testimony, including those portions inexplicably omitted by the School District, that Student's father never stated he would

refuse public school placement for Student under any circumstances but, rather, would refuse public school placement for specific, articulated, reasons.

Next, without citing to any evidence in support, the School District argues that Parents and Student failed to visit the high school and observe the learning environment, or give any genuine consideration to the School District's offer. Even if Parents and Student did not visit the high school or observe the learning environment, this contention *alone* does not support that Parents never intended to agree to a FAPE if one were offered. The School District points to no obligation on Parents or Student to visit the public school, and it is clear from the administrative record that Parents attended the relevant IEP meetings and received, and rejected, the School District's IEPs. Further, the School District's contention that Parents never gave "genuine consideration" to the School District's offers assumes that the School District offered a FAPE, which it did not.

The School District also argues that Parents' administrative due process complaint before the Hearing Officer was "riddled with a number of factually incorrect statements," which constituted a "deliberate attempt to prejudice the District since the complaint is the first document a hearing officers considers." [ECF 26-1 at 27]. As an example, the School District contends that Parents wrongfully asserted that the Hearing Officer in the 2013 due process proceeding "struck down" the 2013 IEP, when instead he found the IEP was "appropriate but too late." (*Id.* at 27 n.25.). However, a fair reading of the 2013 Hearing Officer's decision does not support the School District's contention. In considering tuition reimbursement, the 2013 Hearing Officer, while noting that the June 2013 IEP was not "inappropriate on its face," went on to conclude that the School District's offer of the June 2013 IEP was mere placation to avoid litigation and to put itself in a better position should a due process complaint be filed, and found

Parents justified in rejecting "an IEP that was barely facially appropriate . . . ." (P-34 at 19-21). This is a far cry from "appropriate but too late."

Notably, it is the School District that appears to be making "mischaracterizations of fact." Nonetheless, even if Parents' due process complaint contained inaccuracies, those inaccuracies do not support the School District's contention that tuition reimbursement should be reduced or denied. Clearly, the Hearing Officer had the benefit of the entire administrative record, the presence of the witnesses, as well as briefs from the parties, and did not render the decision on the allegations made in the 2013 due process complaint.[15] The thoughtful decision shows that he considered all the arguments made prior to rendering the decision.

The School District further contends that in May 2016, when it contacted DVFS and Parents in writing to schedule a time to meet with Student at DVFS to assess Student's current performance in order to develop and offer a FAPE for the 2016-2017 school year, "Parents warned the School District that if school employees went to DVFS to assess Student, DVFS would contact the local police and seek criminal action." [ECF 26-1 at 27] (citing ECF 19-2). A fair reading of Parents' May 16, 2016 letter indicates that Parents would not allow the School District to retest Student at DVFS, and that if School District "representatives show up at DVFS, seeking to disrupt [Student's] education without Parental permission, DVFS would be within its rights to contact the local police and have the offending parties removed." [ECF 19-2 at 2]. While hyperbolic, the letter does not threaten the School District officials with arrest.

_____

[15] This Court notes further that the School District's complaint in this case contained the same egregious misquote of Student's father included in its brief in support of its motion, namely that he agreed he would never return Student to public school. [ECF 1 ¶ 10(b)(ii)]. By School District's own logic, this Court could consider this a "deliberate attempt to prejudice [Parents] since the complaint is the first document [this Court] considers." [*See* ECF 26-1 at 27]. Counsel is reminded that there is an obligation to the court that when a pleading or motion is presented to the court the attorney "certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances . . . the factual contentions have evidentiary support . . . ." Fed. R. Civ. P. 11(b)(3).

Finally, the School District argues that Parents refused the School District's May 19, 2016 offer to have Student come to the School District's high school to conduct assessments, and refused to appear at an IEP meeting to develop a FAPE for the 2016-2017 school year. [ECF 26-1 at 28] (citing ECF 19-3, 19-4). As with the alleged threats to have School District officials arrested, Parents' refusal to allow Student to be tested in May 2016 and their refusal to attend an IEP meeting, even if unreasonable, does not mean Parents acted unreasonably prior to the 2015-2016 school year. Further, Parents' refusal to allow Student to be tested was based, according to the May 20, 2016 letter, [ECF 19-4], on the IDEIA's "stay-put" provision, which requires that a "child shall remain in the then-current educational placement of the child" during a proceeding under the IDEIA. 20 U.S.C. § 1415(j). In light of the School District's plans to appeal the Hearing Officer's decision, and in light of the fact that the School District did file this appeal on May 25, 2016, Parents' insistence on refusing to meet with the School District until this case was resolved is not unreasonable behavior.

Parents' conduct can be described as one of "vigorous advocacy," not unreasonable conduct, and did not impede the School District's ability to craft an IEP, NOREP, or FAPE for the 2015-2016 school year. Consequently, equity does not support reducing or denying Parents' tuition reimbursement for Student's 2015-2016 school year.

**CONCLUSION**

This Court finds that the administrative record, as a whole, supports the facts found and legal conclusions reached by the Hearing Officer. These findings are consistent with the requirements of the IDEIA. Therefore, for the reasons stated herein, the decision of the Hearing Officer is affirmed, the School District's motion for judgment and/or for summary judgment on the supplemented administrative record is denied, and Parents' motion for judgment and/or for

summary judgment on the supplemented administrative record is granted.  An appropriate Order

consistent with this Memorandum Opinion follows.

NITZA I. QUIÑONES ALEJANDRO, U.S.D.C. J.